NEWMAN, Circuit Judge,
dissenting.
For decades the United States stood together with the San Carlos Apache *1356 Tribe, in federal and state court, pressing the position that the 1935 Globe Equity Decree did not finally determine the Tribe’s water rights in the Gila River. When the issue was resolved in 2006 in the Arizona Supreme Court, and the Tribe’s water rights were finally lost, the Tribe filed a claim for monetary damages in the Court of Federal Claims. In that court, for the first time, the United States took the position that the claim became time-barred six years after the Globe Equity Decree of 1935. The government now argues, and my colleagues now agree, that the Tribe was required to file this suit for the value of the lost water rights, before the water rights had been finally lost and before any claim for damages arose. The court holds that this Tucker Act claim became time-barred in 1941, although its premises did not arise until the Arizona Supreme Court finally resolved the water rights issue in 2006. Thus this court provides “yet another instance of the manifest injustice which has assailed the Tribe at virtually every turn since their dealings with the United States and its citizens began.” United States v. Gila Valley Irrigation Dist., 804 F.Supp. 1, 5 (D.Ariz.1992). I respectfully dissent.
DISCUSSION
The history of the Gila River water allocation supports the position that the 1935 Decree did not represent the interests of the Tribe.
The San Carlos Apache Indian Reservation, established in 1872 in east central Arizona, is the remnant homeland of approximately 14,000 Tribal members. The Gila River provides Tribal members with water to grow crops and sustain themselves. In 1873, 1874, 1876, 1877, and 1902, the United States stripped out of the Reservation major parcels of land including valuable bottomlands along the Gila River, transferring these lands to settlers who began diverting water from the River. In 1924 construction began of the Coolidge Dam on the Gila River, flooding nearly 22,000 acres of the most valuable remaining Reservation bottomlands. No storage water rights in the impoundment were provided to the San Carlos Tribe; all such rights were dedicated to other water users.
In 1925 the United States initiated the Globe Equity proceeding in the United States District Court for the District of Arizona, to allocate Gila River water rights for the San Carlos Apache Tribe, the Pima Indian Tribe, and others including settlers and farmers. The San Carlos Tribe was not a party to the proceeding and did not participate in the negotiations, while the United States ostensibly represented the San Carlos Tribe as “trustee.” The Superintendent of the San Carlos Agency expressed strong opposition to the terms of the Decree and its adverse impact on the San Carlos Tribe, but his protests were ignored. San Carlos Apache Tribe v. United States, No. 09-46 (Fed.Cl. Jan. 23, 2009) (“Complaint”), ¶36. Other United States officials, such as the Special Assistant to the Attorney General, pressed the position that the United States should not support the San Carlos Tribe’s superior priority to Gila River water. Id. ¶ 38. The resultant 1935 Globe Equity Decree allocated 6,000 acre feet of annual irrigation water to the San Carlos Tribe, amounting to less than two percent of the water allocated in the Decree. In contrast, the Pima Indians Gila River Community was allocated 210,000 acre feet of Gila River annual irrigation water. The record states that this differential treatment was rationalized because “the Pimas are an industrious farming race [while] the Apache are and always have been warlike and in no sense agrarian.” Id. ¶ 39. Non-Indian interests were allocated over 350,-000 acre feet of annual irrigation water. As a result, the Gila River in the San Carlos Reservation is frequently reduced *1357 to a trickle and consists mostly of salt-laden irrigation return flows unsuitable for use. Id. ¶ 33.
In 1979 the San Carlos Apache Tribe filed suit in the United States District Court in Arizona, asserting federal reserved water rights (called Winters rights) in the Gila River and tributaries, based on the ruling in Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), that when the federal government creates an Indian reservation, it “impliedly reserve[s] a right to the amount of river water necessary to effectuate the purpose” of the reservation. Nevada v. United States, 463 U.S. 110, 116 n. 1, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983); see also Arizona v. California, 373 U.S. 546, 600, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963) (“The Court in Winters concluded that the Government, when it created that Indian Reservation, intended to deal fairly with the Indians by reserving for them the waters without which their lands would have been useless.”).
The Tribe’s suit reached the Supreme Court, which held that the Tribe should pursue its Winters claims in Arizona state court, stating that:
The McCarran Amendment, as interpreted in Colorado River [Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) ], allows and encourages state courts to undertake the task of quantifying Indian water rights in the course of comprehensive water adjudications. Although adjudication of those rights in federal court instead might in the abstract be practical, and even wise, it will be neither practical nor wise as long as it creates the possibility of duplicative litigation, tension and controversy between the federal and state forums, hurried and pressured decisionmaking, and confusion over the disposition of property rights.
Arizona v. San Carlos Apache Tribe of Ark., 463 U.S. 545, 569, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983). Thus in 1985 the Tribe filed federal reserved water rights claims in Arizona state court, asserting that the Tribe was entitled to 129,710 annual acre feet of water from the Gila River system, based on Winters rights. The United States filed a separate claim in the Arizona state court “on behalf of the San Carlos Apache Indian Tribe,” asserting “Federal reserved water rights” as the basis of the claim. Statement of Claimant Form, In re: The General Adjudication of all Rights to use Water in the Gila River Sys. and Source, File No. 39-64259 (Ariz.Super.Ct.1985). The United States further stated that “Until the federal court with jurisdiction over the Gila decree of 1935 finally determines the scope of that decree and the res judicata effect of that decree, the United States considers this claim to be an appropriate part of the Tribe’s reserved water rights claim.” Id.
In 2001 various parties, apparently served by Gila River water, moved the Arizona state court for dismissal on the ground that the Tribe’s claims, and the federal government’s claims on behalf of the Tribe, were res judicata based on the 1935 Globe Equity Decree. In response the United States stood with the Tribe, and argued that the Tribe is entitled to a trial on the adequacy of United States representation in the Globe Equity Decree, based on due process considerations. See U.S. Br. 80-81, In re: The General Adjudication of all Rights to use Water in the Gila River Sys. and Source, No. WC-02-0003-IR (Ariz. 2005) (“[W]e agree with the Apaches that a remand for further proceedings would be appropriate. Among other things, to determine whether the United States exercised ‘due diligence and reasonable prudence’ in prosecuting the Globe Equity Decree on behalf of the Apaches.”). The United States and the *1358 Tribe argued that the Globe Equity Decree did not extinguish the Tribe’s Winters rights. Id. at 31.
The Arizona Supreme Court held that the Globe Equity Decree of 1935 “precluded” the continuing existence of preserved aboriginal or Winters rights for the Tribe. The Arizona court explained that the claim was precluded although the issue was not litigated and the Globe Equity Decree did not mention federal reserved or aboriginal water rights. In re: The General Adjudication of All Rights to Use Water In the Gila River Sys. & Source, 212 Ariz. 64, 127 P.3d 882, 888-95 (2006) (holding the San Carlos claim precluded as to the mainstem waters but not the tributaries of the Gila River). The Arizona Supreme Court declined to inquire into the questions of privity and the adequacy of the United States’ representation of the Tribe in connection with the Globe Equity Decree, holding that such an inquiry was barred by “the doctrine of comity.” Id. at 898.
The Arizona court declined to review the challenges to the Decree by both the Tribe and the United States, stating that the issue of inadequate representation should be brought “in the forum responsible for issuing, interpreting, and enforcing the Decree,” id. at 900, and that its merits could not be explored in state court — ignoring the ruling of the United States Supreme Court that the Tribe and the federal government should pursue in state court the claims that they had raised in federal court. In declining to consider the Tribe’s arguments based on inadequate representation, the Arizona Supreme Court “expressed] no opinion as to what other remedies, if any, might be available to the Tribe for the Government’s allegedly inadequate representation.” Id. at 901 n. 21 (citing Arizona v. California, 460 U.S. 605, 628 n. 20, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (“noting that ‘in an appropriate case the Tribes’ remedy for inadequate representation by the government may lie in the Court of Claims’ ”)).
Nonetheless, this court today holds that all of the Tribe’s rights were fully, definitively, and finally resolved in 1935, and that the claim for damages under the Tucker Act, although it could not have been brought in 1935, nonetheless expired six years thereafter. My colleagues bar the Tribe from exploring the events surrounding the 1935 Decree, although until the Arizona Supreme Court in 2006 finally disposed of the question, the United States had itself challenged the comprehensiveness and binding effect of the Globe Equity 1935 Gila River allocation.
The Arizona Supreme Court decision finally ended the Tribe’s claims to historic and adequate ('Winters) water rights, rights that had been the subject of decades of dispute and litigation. No monetary claims were extant, for the Tribe’s concern was access to Gila River water. Until the present case, there was no monetary claim against the government, and thus no cause of action under the Tucker Act.
Precedent illustrates that monetary claims do not accrue against the United States until the claims have sufficiently ripened. In Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed.Cir.1988), this court held that “a cause of action against the government has ‘first accrued’ only when all the events which fix the government’s alleged liability have occurred and the plaintiff was or should have been aware of their existence,” in that case a Tucker Act claim for breach of trust with respect to an Indian tribe. In Samish Indian Nation v. United States, 419 F.3d 1355, 1369 (Fed.Cir.2005), this court held that “the Samish claims did not accrue until the Samish, through their administrative challenges, obtained a final ruling by a district court under the APA,” the court explaining that: *1359 “A claim accrues under [Tucker Act] § 2501 Vhen all events have occurred to fix the Government’s alleged liability, entitling the claimant to demand payment and sue here for his money.’ ” (quoting Martinez v. United States, 833 F.3d 1295, 1303 (Fed.Cir.2003) (en banc)).
The San Carlos Tribe’s claim for water rights was not resolved until the Arizona Court held in 2006 that the Tribe’s rights in the main stem of the Gila River were controlled by the Globe Equity Decree but that the Decree did not govern the tributaries. The United States had argued in Arizona that the Globe Equity Decree did not extinguish the Tribe’s Winters rights. See U.S. Br. 31 (Ariz. 2005) (“In the present adjudication, the United States filed a statement of claimant on behalf of the Apaches asserting rights in the upper Gila River watershed beyond the rights (just noted) that are recognized in the Globe Equity Decree ... In asserting these claims, the United States relies on the doctrine of federally reserved water rights. See Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908).”). The United States pointed out that the Decree states a priority date of 1846, which does not match the date of the founding of the San Carlos Reservation (1872), as it would if the Decree were based on Winters rights. Id. at 30; Arizona v. California, 373 U.S. at 600, 83 S.Ct. 1468 (Winters rights are effective “as of the time the Indian Reservations were created.”).
The United States also stated in the Arizona litigation that “the provisions in the Globe Equity Decree relating to the Apaches’ rights are unconventional” and “have been subject to continuing controversy from their inception.” U.S. Br. 29 (Ariz. 2005). The arguments by the United States in the Arizona litigation demonstrate that the controversy was continuing, and was generally understood to be continuing. Only after the water rights claim was finally lost in 2006, did a cause of action for monetary damages start to accrue. Until then, there was no ripened Tucker Act claim. The statute of limitations as to a claim in the Court of Federal Claims could not have started to run in 1935.
The case of Catawba Indian Tribe of South Carolina v. United States, 982 F.2d 1564 (Fed.Cir.1993), relied on by the panel majority, is too remote, in fact and law, to govern this case. In Catawba this court held that the statute of limitations barred suit to recover certain lands or the value thereof, lands that had been removed from the Tribe by a 1959 statute (effective in 1962) that the Supreme Court ruled to be unambiguous on its face and “unmistakably clear” in South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 505, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986). This court held that the statute of limitations accrued from the date of the 1959/1962 statute, or, at the latest, from 1972 when the ten-year period of adverse possession of the lands had run. Catawba, 982 F.2d. at 1571. In Catawba the United States refused to recognize the lands as belonging to the Tribe, whereas for the San Carlos water rights the United States supported the Tribe’s claim, and the water rights issue was acknowledged by the Supreme Court to be unresolved when the issue was consigned to the Arizona courts for resolution.
Only after the highest court of Arizona ruled in 2006 that the Decree would be held operative against the Tribe to the preclusion of Winters rights, were the federal reserved and aboriginal water rights resolved. This is not a “tangential legal question,” as the government now argues, U.S. Br. 27, but the core determinant of a claim for damages, a claim that accrued only after Arizona ruled that the water *1360 was finally lost. The 2006 Arizona ruling is akin to the threshold determination in Samish Indian Nation, 419 F.3d at 1373, where this court held that until wrongful action was shown to exist, the statute of limitations could not start to run against a Tucker Act suit for compensation for such wrongful act. The Samish Nation was required to obtain a determination of wrongfulness in the district court. In both cases, the statute of limitations could not start to run until an essential premise of the claim was resolved. See id. at 1369 (“If a necessary element to a claim must be established in a different forum, the claim will not accrue for § 2501 until that element is finally established in the other proceeding.”). Cf. White Mountain Apache Tribe v. Clark, 604 F.Supp. 185, 190 (D.Ariz.1984) (dismissing the Tribe’s federal claims as premature until the Tribe’s water rights were determined in the Arizona state forum).
The San Carlos Tribe has persistently argued that it was not adequately represented in connection with the 1935 Decree, and in the Arizona courts the United States urged that the Tribe was entitled to a hearing on this issue, stating:
[W]e support the Apaches’ request for a remand to the Superior Court for further proceedings on the Apaches’ argument under Section 42(l)(e) of the Restatement (Second) of Judgments.... As we explained, under controlling precedent of the Ninth Circuit, the inadequate representation exception to res judicata, as set out in Section 42(l)(e) of the Restatement (Second) of Judgments is available to the Apaches. The Apaches clearly raised this exception in the proceedings below and the Superior Court clearly failed to address it, either on the law or facts ... there is no denying that the Superior Court gave the Apaches’ arguments short shrift.
U.S. Reply Br. 62, 70, In re: The General Adjudication of all Rights to use Water in the Gila River Sys. and Source, No. WC-02-0003-IR (Ariz. 2006). Until the Arizona Supreme Court declined to decide this issue, the binding effect of the Global Equity Decree remained in contention, for precedent supports the Tribe’s argument that since it was not a party, and since it was inadequately represented, it was not bound. See United States v. Truckee-Carson Irrigation District, 649 F.2d 1286, 1307 (9th Cir.1981) (“When the government breaches its trust to the Tribes while openly advancing its own interest the Tribe is not necessarily bound ... such a limitation to preclusion based on due process is proper.”).
“Because of its treaty and statutory obligations to tribal nations, the United States must be held to the most exacting fiduciary standards in its relationship with the Indian beneficiaries.” The Shoshone Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339, 1348 (Fed.Cir.2004); see generally Nevada v. United States, 463 U.S. at 127, 103 S.Ct. 2906 (“This Court has long recognized the distinctive obligation of trust incumbent upon the Government in its dealings with Indian tribes.”). Basic principles of due process and fiduciary obligations establish that inadequate representation by a trustee renders the action non-binding on the purported beneficiary. See Restatement Second of Judgments § 42(l)(e) (1982) (“A person is not bound by a judgment for or against a party who purports to represent him if ... The representative failed to prosecute or defend the action with due diligence and reasonable prudence, and the opposing party was on notice of facts making that failure apparent.”). Cf. Pelt v. Utah, 539 F.3d 1271, 1284-89 (10th Cir.2008) (Navajo beneficiaries of oil and gas royalty fund administered by the state, requesting an accounting, were not bound *1361 by previous class actions to which these beneficiaries were not parties, since their interests were not adequately represented as required by due process, for the absent beneficiaries’ interests were not “vigorously pursued and protected”). These principles further impugn the finality of the 1935 Decree as to the Tribe, for, as stated in Holland, Band of Pomo Indians, “[t]he general rule is that the statute of limitations ‘does not run against a beneficiary in favor of a trustee until the trust is repudiated and the fiduciary relationship is terminated.’ ” 855 F.2d at 1578 (quoting Manchester Band of Pomo Indians, Inc. v. United States, 368 F.Supp. 1238, 1249 (N.D.Cal.1973)).
In the analogous case of Fort Mojave Indian Tribe v. United States, 23 Cl.Ct. 417 (1991), aff'd, No. 95-5014, 1995 U.S.App. LEXIS 23960 (Fed.Cir.1995), the Fort Mojave Tribe sought damages for loss of water rights due to allegedly inadequate representation by the United States as trustee in litigation leading to a 1964 consent decree. The government argued that the Tribe’s claim for damages accrued with the 1964 decree and thus was barred by the statute of limitations. The Court of Federal Claims held, and this court affirmed, that the Tribe’s claim did not accrue until 1983, when the Supreme Court, in Arizona v. California, 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983), finally interpreted the rights established by the 1964 decree.
In Fort Mojave, as in this case, the United States had stood together with the Tribe in litigation attempting to secure additional water rights for the Tribe, and the United States had acted as trustee for the Tribe in entering the earlier consent decree. The Claims Court reasoned: “Since the ultimate outcome of the United States’ continuing trust actions (both pre- and post-1963) remained very much in doubt until the Supreme Court’s 1983 decision, ‘all the events’ which fixed liability for a breach of trust had not occurred until the issuance of that decision.” Fort Mojave, 23 Cl.Ct. at 429. The court pointed out that the government’s position “would demand that plaintiffs file their breach of trust action at a time when, rather than assuming a position adverse to plaintiffs’ interests, the United States had acknowledged its error and was working hand in hand with plaintiffs in an effort to redress that error.” Id. at 431.[1] This reasoning remains apt, along with the court’s observation that no precedent supported the government’s position that the action for damages was time barred under such circumstances. Id. As this court explained in Bayou Des Familles Dev. Corp. v. United States, 130 F.3d 1034, 1038 (Fed.Cir.1997), “Starting the statute of limitations clock” occurs when the “claim become[s] ripe for adjudication.” See also Corman, Limitation of Actions, § 6.1, p. 374 (1991) (a claim does not accrue until all events necessary to fix the liability of the defendant have occurred).
The path of precedent is clear. The San Carlos Apache claim for damages did not ripen until 2006, when the water rights were finally adjudicated. As observed ante, in Arizona v. California, 460 U.S. at 628 n. 20, 103 S.Ct. 1382, the Court noted that “in an appropriate case *1362 the Tribes’ remedy for inadequate representation by the Government may lie in the Court of Claims.” That is the present situation: the issue of water rights was finally resolved by the Arizona Supreme Court in 2006, thereby ripening the claim for monetary damages. From my colleagues’ ruling that this claim arose in 1935 and became barred six years later, I must, respectfully, dissent.